IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | |
| | * | |
| JEFFREY R. CUMMINGS, JR., | * | CRIMINAL NO. CCB-19-0342 |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | ****** | |

**GOVERNMENT'S CONSOLIDATED RESPONSE
TO DEFENDANT'S PRE-TRIAL MOTIONS**

A federal judge issued thirteen search warrants authorizing the search of seized postal parcels, data related to dozens of electronic accounts, and Cybertips all associated with the online sexual exploitation of multiple children. Investigators also secured federal warrants to search the defendant's residence and person and to seize physical evidence. Following his arrest, the defendant made statements pursuant to knowing, intelligent, and voluntary written and oral waivers of his *Miranda* rights. For the reasons set forth below, the defendants' motions should all be denied.

**I.      PROCEDURAL HISTORY**

On July 18, 2019, a Grand Jury in the District of Maryland returned a seven-count Indictment against Jeffrey R. Cummings, Jr., charging him with Sexual Exploitation of a Minor, in violation of 18 U.S.C. § 2251(a) (Counts One through Three), Enticement of a Minor to Engage in Unlawful Sexual Activity, in violation of 18 U.S.C. § 2422(b) (Counts Four through Six), and Penalties for Registered Sex Offenders, in violation of 18 U.S.C. § 2260A (Count Seven). In July

2019, the defendant had both an initial appearance and an arraignment, and the defendant was ordered held in the custody of the United States Marshals Service pending trial.

A motions hearing is scheduled for January 21, 2020 at 2:15 p.m. and a two-week jury trial is scheduled to commence March 9, 2020.[1]

The defendant has filed motions to suppress the evidence seized pursuant to federal search warrants (Dkt. #30) and the statements he made pursuant to his *Miranda* waivers (Dkt. #29). For the reasons set forth below, both of these motions should be denied.

## II.  FACTUAL BACKGROUND

### A. The Execution of Warrants to Search Accounts and Parcels Associated with the Online Sexual Exploitation of Children

On April 12, 2019, United States Magistrate Judge A. David Copperthite issued warrants authorizing the search of the following:

- 5 Facebook Accounts;
- 2 Instagram Accounts;
- 4 Google Accounts;
- 1 AOL Account; and,
- 3 U.S. Postal Service Parcels.

Attached as Exhibit 1.[2]

---

[1] Counsel for the government has informed the defense that a Superseding Indictment may be presented to the Grand Jury in advance of the scheduled motions hearing. It is anticipated that any new charges will be of a similar nature, involving additional victims, and that evidence relating to additional victims has been included in the discovery provided to the defendant thus far, and any further discoverable information will be produced as it is obtained. The government does not believe that any additional charges or discovery will impact the defendant's pretrial motions, but would not object to the defendant's filing of any additional motions resulting from any additional charges.

[2] The filed copy of the affidavit appears to be missing page 3, which lists the Instagram, Google, and AOL accounts sought by the applications. This information is also set forth in Attachments A2, A3, and A4, to the warrants, respectively.

In support of the applications seeking these warrants, U.S. Postal Inspector Rodriguez submitted an affidavit establishing probable cause that each of these locations would contain evidence of the listed criminal offenses. The affidavit sets forth evidence that the defendant had used a number of online aliases to communicate with minors using the accounts targeted by the requested warrants, including enticing the minors to send him images of themselves engaged in sexually explicit activity, and sending the children money and gifts in exchange for them shipping him their dirty socks. A warrant was also issued authorizing the search of postal parcels related to the communications with the children.

Specifically, the affidavit describes the defendant's sexual abuse of a ten-year-old boy in 2007 and his resulting conviction in 2008 for Sex Offense in the Third Degree. Ex. 1 ¶¶17-19. In that case, the defendant bought video games and other gifts for the victim, and told investigators that he had a sexual compulsion towards children and got sexual gratification from touching them. *Id.* ¶18.

In October 2016, a Facebook user with the account name "Ryan Miller" contacted "Boy 1"[3] online, according to the boy's guardian's report to the National Center for Missing and Exploited Children (NCMEC). *Id.* ¶ 20. "Miller," who claimed to live in Spokane, Washington, sent Boy 1 two U.S. Postal Service (USPS) parcels that made Boy 1's legal guardian very uncomfortable. *Id.* She reported that in February 2017 "Ryan Miller" sent Boy 1 a parcel containing $20 and a video game. *Id.* On March 13, 2017, "Ryan Miller" sent Boy 1 a second USPS parcel containing an empty pre-addressed return parcel. *Id.* According to Boy 1, "Ryan Miller" asked Boy 1 to send him dirty socks using the pre-addressed parcel. *Id.* The parcel was addressed to "Ryan Miller, PO Box 27681, Towson, MD, 21285." *Id.*

---

[3] The pseudonyms used for the minor boys in this response are the same as those used in the search warrant affidavits at issue in the defendant's motion.

On May 20, 2017, the defendant was caught using a computer at the Towson public library to access a Facebook account in the name of "Miller Ryan." *Id.* ¶21. The Library manager observed the defendant, registered to use the computer under his own name, sending a photograph of a completely naked female in a Facebook private message, and observed that another user sent the defendant an image of a shirtless boy through the Facebook private messages. *Id.* The following day, the defendant was again observed on a library computer accessing Facebook private messages, and the library manager called the police. *Id.* ¶22. The defendant told officers that he was using his son's Facebook account to monitor his son's online activities. *Id.* Information obtained in the course of the current federal investigation confirms that the defendant does not have any children. *Id.* ¶23. Investigators searched the "miller.ryan.7311" Facebook account, pursuant to a warrant issued by a Baltimore County judge, and located numerous sexually explicit chat sessions and photos of male subjects of undetermined ages. *Id.* ¶24.

The affidavit goes on to describe a series of related online communications and exchanges of parcels with minor boys, and provides specific information establishing probable cause to search each of the accounts listed in the proposed search warrants:

**Facebook Accounts**

- "**Oliviaevans1w7e9w0wndjdjdjskaj**" (**the "Olivia Harris" account**): On March 7, 2019, the Spokane Tribal Police Department (STPD) received a report from a mother that the "Olivia Harris" account was used to conduct an online "dating" relationship with her son, "Boy 5.[4]" *Id.* ¶32. Boy 5 told his mother that he had been corresponding with "Olivia" and "Richard Web" using Facebook messenger, and that his communications with "Olivia" became suggestive. *Id.* Boy 5 admitted that he filmed himself from the waist down and sent it to "Olivia." *Id.* Boy 5's mother reviewed the messages sent to the boy by "Olivia" and "Richard Web" and believed them to be from the same person. *Id.* ¶33. The mother used Boy 5's account to message "Olivia" and saw the user's profile name

---

[4] The minor victim listed as "Boy 5" in the affidavit is the victim described as "Boy 1" in the Indictment.

change from "Olivia Evans D'Andrea" to "Olivia Harris" during the conversation. *Id.*

Boy 5's cell phone contained Facebook messenger chats with Oliviaevans1w7e9w0wndjdjdjskaj (the "Olivia Harris" account). In one chat, "Olivia Harris" referenced an individual named "Richard," stating, "I need you to tell this kid that richard is cool" and later asked, "Can richard call u?" *Id.* ¶38.

"Olivia Harris" also asked Boy 5 "Can i see your meat bae?" "Hey my love Can i see your hotdog?" and "Can you make me a video? Of you take your shirt off your pants your socks then your boxers Plz." Following the last request, Boy 5 sent "Olivia" a video of a child removing his shirt, his pants, and his boxers, displaying the child's penis. *Id.* ¶39.

"Olivia" also asked Boy 5 if he knew anyone in Grand Coulee and if he knew Boy 2, who "Olivia" described as "the 11 year old." *Id.* ¶40. Boy 2 is the approximately nine year-old boy in Grand Coulee, Washington, who received a USPS package from Baltimore with a return address of "Richard Webster" and was apparently friends with "Richard Web" on Facebook. *Id.* ¶¶25-27.

- "**richard.west.5220**" (**the "Richard Web" account**): Boy 5 and "Olivia Harris" discuss "Richard" in their Facebook chats, including "Olivia" telling Boy 5 "I need you to tell this kid that richard is cool" and "Can richard call u?" *Id.* ¶38. Boy 5 was in phone and text contact with an individual he knew as "Richard Web," who was using the phone number (509) 730-7999.[5] *Id.* ¶32. This is the same phone number used to call the USPS to check on the status of parcels sent to Boy 2 (Boy 2 was referenced by "Olivia" in chats, as discussed *supra*). *Id.*

Boy 5 engaged in Facebook chats with the "Richard Web" account. *Id.* ¶42. Throughout these chats, "Richard Web" asked Boy 5 for pictures of his younger brother, and Boy 5 sent candid photos of the boy in response. *Id.* "Richard Web" also asked to talk with Boy 5's younger brother. *Id.*

On March 1, "Richard "Web" sent Boy 5 a Facebook message saying "Buddy its getting mailed tomorrow." *Id.* ¶43. The following day, "Richard Web" sent Boy 5 a photograph of a USPS receipt with tracking information. *Id.*

On March 3, 2019, Boy 5 received a USPS priority mail package labeled as being from "Richard Webster, 202 E Sintos Ave, Spokane, WA 99202" *Id.* ¶34. The package contained $50 in cash, as well as a pre-addressed return envelope. *Id.* The package was actually sent to Boy 5 from Baltimore, Maryland. *Id.* ¶35. Boy 5 reported that, in exchange for the money, he was supposed to send a pair of dirty socks back in the return envelope. *Id.* ¶34. The return envelope in the package was addressed to "Ryan Miller, PO Box 27681, Towson, MD, 21285."

---

[5] It should be noted that, as described in ¶¶ 44-45, the defendant created an account with usps.com on June 6, 2018, wherein he registered the account to "Jeffrey R. Cummings," P.O. Box 27681, and provided the phone number of (509) 730-7999.

*Id.* ¶36. This is the same name and PO Box "Ryan Miller" gave to Boy 1 for that boy to send dirty socks in exchange for $20 and a video game in 2017. *Id.* ¶ 20. Later in 2017, the defendant was observed in the Towson library using a "Miller Ryan" account to exchange nude and partially nude images with juvenile boys. *Id.* ¶21.

The phone number Boy 5 had for "Richard Web" was the same phone number used to call the Postmaster in Grand Coulee, Washington to check on a package. *Id.* ¶25, 32. The caller identified himself as "Boy 2" or Boy 2's parent. *Id.* Boy 2 was approximately nine years old and later came to the post office to ask how much it would cost to mail socks to his friend. *Id.* Boy 2 later returned and mailed a parcel. Several days later, the Postmaster saw Boy 2 throw away a USPS Priority Express envelope in the Post Office trash. The envelope was addressed to Boy 2 from "Richard Webster" with a Spokane, Washington, address, however postal records showed that the envelope was actually mailed to Boy 2 from Baltimore. *Id.* Investigators located a Facebook profile in Boy 2's name, and found it was friends with an account with the display name "Richard Web" (richard.west.5220) and that all of the comments and likes on that account were from what appeared to be accounts of juvenile boys. *Id.* at ¶27.

The "Richard Web" account was also used to communicate and exchange parcels with Boy 3 (13 years old) and Boy 4 (9 years old), including exchanges of socks for cash. *Id.* ¶28.

A review of Facebook chats showed that "Richard Web" sent a photo of a naked erect penis to Boy 3 and chatted about his younger brother as well. *Id.* ¶ 30. A package sent to Boy 3 had a return address of "Richard Webster, 202 E. Sintos Ave" but was actually mailed from , MD 21233. *Id.* ¶31. This was the same return name and address used to send packages from Baltimore to Boy 5. *Id.* ¶34.

The "Richard Web" Facebook account was also friends with Boy 7 and Boy 8, both in Washington State. *Id.* ¶¶49 and 51. The phone number (509) 730-7999 was used to inquire with USPS about the status of packages sent to Boy 7 and Boy 8. *Id.* ¶¶47 and 50. This is the same phone number Boy 5 used to communicate with "Richard Web" and to check on a package expected from Boy 2. *Id.* ¶¶ 25 and 38.

- "**richard.webster.1426876**" (**the "Richard West" account**): In addition to "Richard Web," Boy 8 was also Facebook friends with "Richard West" (richard.webster.1426876). *Id.* ¶ 51. The Richard West account was accessed on January 14 and 19, 2019, from an IP address assigned to the Enoch Pratt Free Library in Baltimore. *Id.* ¶53. The Richard West Facebook account was also friends with Boy 10, in Nespelem, Washington. *Id.* ¶56.

  The phone number (509) 730-7999 was used to inquire with USPS about the status of a package sent to Boy 10, which was sent with a return address from Spokane, Washington, but was actually mailed from Baltimore, MD 21233.

- "**ryan.mi.1401**" (**the "Ryan Mi" account**): The phone number (509) 730-7999 was used to inquire with USPS about the status of a package sent to Boy 9 in Yakima, Washington. *Id.* ¶ 54. The package had a return address of "Ryan Miller, 202 E. Sintos Ave, Spokane, WA 99202," but was actually mailed from Baltimore, MD 21233. *Id.* This is the same return address listed on packages sent to Boy 3 and Boy 5 from Baltimore, MD 21233. *Id.* ¶¶31 and 34. A Facebook account was located for Boy 9, which was friends with "ryan.mi.1401" (the "Ryan Mi" account). *Id.* ¶55.

  The only photograph available on the "Ryan Mi" account was the same as displayed on the "Richard West" account. *Id.*

- "**100026243473386**" (**the "Ryan Miller" account**): Boy 10, who received a package from Baltimore with a Spokane return address that was checked on by someone from the (509) 730-7999 phone number, was Facebook friends with "Ryan Miller" (100026243473386) as well as "Richard West." *Id.* ¶¶56-57. "Ryan Miller" is the same alias name used by the defendant when he was seen exchanging sexual Facebook messages and photos with juvenile males at the Towson library in 2017. *Id.* ¶20.

  "Ryan Miller" was also the alias the defendant used when requesting Boy 1 and Boy 5 to send socks to PO Box 27681, in Towson, and in the return address for a package sent to Boy 9. *Id.* ¶¶20, 36, 54. Like the "Richard Web," account, the "Ryan Miller" account posted a photograph of U.S. currency. *Id.* ¶27 (the "Richard Web" account) and ¶ 57 (the "Ryan Miller" account).

**Instagram Accounts**

- "**cleveland80872018**": This account, with the profile name "Richard" has the registered email address cleveland8087@gmail.com, which is linked directly to the defendant through his usps.com account, which is registered in the name "Jeffrey R. Cummings, Jr.," at "PO Box 27681, Towson, MD, 21285" with phone number (509) 730-7999. *Id.* ¶¶45 and 62.

- **"richard.west.5220":** This Instagram account name is the same as the "Richard Web" Facebook account. *Id.* ¶26. The profile name is "richardwest" and the only publically available photograph posted to the account appeared to be of a juvenile boy. *Id.* ¶64. The majority of the Instagram account's followers, or the accounts "richardwest" was following appeared to be accounts belonging to juvenile boys. *Id.* The email associated with the "richardwest" Instagram account was ryanatlanta9012@gmail.com, the same email account associated with the "Richard Web" Facebook account, used to communicate with Boy 5. *Id.* ¶¶ 42, 49, and 64.

**Google Accounts**

- **cleveland8087@gmail.com**: This email account was used to register the defendant's usps.com account, which was linked to "PO Box 27681, Towson, MD, 21285" used to receive packages from Boy 1 and Boy 5. *Id.* ¶45. This usps.com account was also linked to the phone number (509) 730-7999, which was used to communicate with Boy 5, and to check on parcels sent to or expected from Boy 2, Boy 7, Boy 8, Boy 9, Boy 10, Boy 11, and Boy 12. *Id.* ¶¶ 25, 32, 45-47, 50, 54, 56, 59-61.

- **ryanatlanta9012@gmail.com**: This email account was used to register the "Richard Web" Facebook account from an IP address assigned to the Enoch Pratt Free Library in Baltimore. *Id.* ¶49. It was also used to register the "richardwest" Instagram account. *Id.* ¶64.

- **miller90128@gmail.com**: This email account was the backup email account for cleveland8087@gmail.com. *Id.* ¶63. The miller90128@gmail.com account was also used to register the "Ryan Miller" Facebook account from an IP address assigned to the Enoch Pratt Free Public Library in Baltimore. *Id.* ¶58.

- **newyork5246@gmail.com**: This email account was used to register the "Olivia Harris" email account, which was used to communicate with and receive a sexually explicit video from Boy 5. *Id.* ¶¶ 32-41.

**AOL Account**

- **richwebster@aol.com**: This email account was used to register the "Richard West" Facebook account. The "Richard West" Facebook account was friends with a Facebook account appearing to belong to Boy 8, who was also Facebook friends with "Richard Web." *Id.* ¶51. Boy 8 was sent a package from Baltimore that was checked on using the phone number (509) 730-7999. *Id.* ¶¶50-51.

    The "Richard West" Facebook account was accessed on January 14, 2019 and January 19, 2019 from an IP address registered to the Enoch Pratt Library in Baltimore.

The Court also authorized the search and seizure of three USPS packages, two sent from Baltimore (but purporting to have been sent from a "Ryan Miller" and a "Richard Webster," respectively, in Spokane Washington) to minor boys in Washington State, and one package sent from Boy 12 to "Ryan Miller" at the defendant's P.O. Box, 27681, Towson, MD 21285. *Id.* ¶¶ 4, 54, 59-61. The phone number (509) 730-7999 was used to make inquiries about each of these seized parcels. *Id.* ¶¶ 54, 59, and 61.

### B. The Execution of Warrants to Search Additional Accounts and the Defendant's Residence and Person

On July 18, 2019, the Grand Jury returned the Indictment in this case. On the same day, United States Magistrate Judge A. David Copperthite issued warrants authorizing the search of the following:

- The defendant's person;
- The defendant's residence;
- 7 Google accounts;
- 3 Facebook accounts; and,
- 1 AOL account;

Attached as Exhibit 2.

In support of the applications seeking these warrants, U.S. Postal Inspector Rodriguez submitted an affidavit establishing probable cause that each of these locations would contain evidence of the listed criminal offenses. The affidavit set forth communications between the target accounts and minor boys located within data obtained from the execution of prior search warrants, including several group chats including minor boys, accounts searched pursuant to the prior warrants, and accounts sought by the new affidavit. Some of the communications with the minor boys were sexual in nature or were about the sale of socks. *Id.* ¶¶19, 22. These chats also included threats of violence towards the minor boys for failing to mail socks. *Id*. ¶25. Several of the Google accounts listed in the new warrant were found to be linked to accounts searched pursuant to the prior warrant, as secondary accounts or because they were accessed using the same mobile device. *Id.* ¶¶29, 30.

The second affidavit also sought warrants to search the defendant's person, including any digital devices on his person, and his residence. This residence was where the defendant was

registered with the Maryland Sex Offender Registry, and where he had been located during an unannounced address verification on July 9, 2019. *Id*. ¶32.

### C. **The Defendant's Voluntary, *Mirandized* Statements**

On July 19, 2019, at approximately 7:13 a.m., following his arrest, the defendant waived his *Miranda* rights orally, and in writing, and agreed to speak with investigators. At the beginning of the recorded interview, investigators removed the defendant's handcuffs, and provided him with his morning medication, as requested. Agents also provided the defendant with water, and confirmed that he was not under the influence of alcohol or any drugs, and that nothing was impairing his ability to understand what was going on. They then read him the rights advisement form:[6]

> Corn:  Okay. Um.., so I'm gonna go ahead and read this form to you. You can also read it.  Um.., it says before we ask you any questions, you must understand your rights.  You have the right to remain silent. Okay.  Anything you say can be used against you in court.  You have the right to talk to a lawyer for advice before we ask you any questions and you have the right to have a lawyer with you during questioning and if you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
>
> Cummings:   Okay.
>
> Corn:  If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time and then the next line says "I have read the statement of my rights or it's been read to me.., um.., and I understand what my rights are and at this time, I'm willing to answer questions without a lawyer."  So if that's true, you can sign right here and we can witness it.
>
> Cummings:    Okay... Now if I ask for one ah.., do I have to wait to he…, wait weeks to get one but then you guys talk to me or what?
>
> Corn:  I'm sorry, what was the question?
>
> Cummings:    If I ask for an attorney, then how's that work?

---

[6] All quotations are from a *draft* transcript of the recorded interview, and provided for the Court's convenience. A copy of excerpts of the actual recording will be introduced by the government at the hearing on the pending motions.

Page 10 of 10

> Corn: Um, then we would ah, either you could tell us f.., an attorney to call or we could get one with the court system.
>
> Cummings: And then it would be weeks or months before you guys will talk to me.
>
> Corn: Well that we don't know.  Yeah.  It…  I don't know how long it would be.  It would be up to probably you and your attorney.
>
> Cummings: All right, we can talk.
>
> Corn: Okay.
>
> Rodriguez: But like I said, if any time if you wanna stop…,
>
> Cummings: Okay.
>
> Rodriguez: …that's fine too.
>
> Cummings: Do I check any boxes?
>
> Corn: Nope, just sign.
>
> Rodriguez: Right there.
>
> Corn: Exactly.
>
> (The sound of writing noise).
>
> Cummings: Date it?
>
> Corn: Sure.
>
> Rodriguez: Can't hurt.
>
> (The sound of writing noise.  The sound of papers being handled).
>
> Corn: And then we'll.., we'll sign the witness line.
>
> (The sound of papers being handled). (Writing Noise).

A copy of the written waiver signed by the defendant is attached.  Exhibit 3 (First *Miranda* Waiver).  During the lengthy interview, the defendant made numerous statements attributing exchanges of nude photos on Facebook and the solicitation of dirty socks for a sexual fetish to his sons Sean (15) and Ryan Miller (9).  He stated that his sons lived with his mother in Pennsylvania.

He also made statements about asking his brother to pick up socks from his PO Box and deliver them to his son Ryan in Pennsylvania.  The defendant also made statements linking many of the email addresses located during the investigation to his sons, his brother, and their associates.  He made statements attributing the solicitation of nude photos from minors to his older son.[7]

At the conclusion of the interview, the defendant consented to taking a polygraph exam regarding whether he had any sexual contact with minors.  The defendant was again advised of his *Miranda* rights orally and in writing, and by a different investigator than had advised him during his previous interview. The defendant again waived his rights and agreed to proceed with the polygraph examination and, beginning at approximately 11:12 a.m., he executed written consent to a polygraph and waiver of rights forms. Copies of these written waivers are attached.  Exhibit 4 (Second *Miranda* Waiver); Exhibit 5 (Consent to Polygraph).

During the examination, the defendant denied any sexual contact with minors since his prior conviction in 2008. The polygraph results indicated that the defendant was deceptive, and that he did not pass the polygraph exam.[8] After learning that he did not pass the polygraph, the defendant was interviewed further, and he again denied having sexual contact with minors since the date of his prior conviction in 2008.  The defendant went on to describe a 2016 incident where he purportedly went to a hotel with a girlfriend and her 12-year-old son.  He stated that because the girlfriend smoked, the defendant got his own room, and the boy requested to sleep in the defendant's room. The defendant stated he went into the bathroom while the child took a bath in order to bring him towels, but he claimed that he did not touch the child.  He stated that he then watched movies in bed with him the rest of the evening and did not touch the child.

---

[7] As confirmed during interviews with the defendant's mother and reviews of public records, the defendant is an only child and does not have a brother. He does not have any sons, has never fathered or raised any children, and has never been married. The defendant's mother has never raised or kept any children for the defendant.

[8] The government does not anticipate introducing the defendant's failed polygraph as evidence in its case-in-chief.

### D. The Execution of Warrants to Search Additional Accounts and Cybertips

On November 5, 2019, United States Magistrate Judge A. David Copperthite issued warrants authorizing the search of the following:

- 14 Facebook Accounts;
- 1 Snapchat Account; and,
- 20 Cybertipline reports.

Attached as Exhibit 6.

In support of the applications seeking these warrants, U.S. Postal Inspector Rodriguez submitted an affidavit establishing probable cause that each of these locations would contain evidence of the listed criminal offenses. The affidavit sets forth communications between the target accounts and minor boys located within data obtained from the execution of prior search warrants, including several group chats including minor boys, accounts searched pursuant to the prior warrants, and accounts sought by the new affidavit. The group chats also include recorded oral threats of rape and school shootings towards the minor boys by a voice identified as belonging to the defendant. *Id.* ¶¶23, 24. Many of the target Facebook accounts were also linked to NCMEC cybertips submitted by Facebook, related to "apparent child pornography" and "online enticement-pre-travel." *Id.* ¶¶26-41. The warrants issued by the Court also authorized the search of data related to the NCMEC cybertip submissions by Facebook. The affidavit also sets forth information about the accounts linked to the Samsung phone seized from the defendant's bedroom during execution of the warrant to search his residence. *Id.* ¶42. This phone was found to have been used to access a number of accounts searched pursuant to prior warrants, as well as accounts targeted by the most recent applications. *Id.*

### III. THE DEFENDANT'S MOTIONS TO SUPPRESS SHOULD BE DENIED

## A. The Court Should Not Suppress the Fruits of Valid Search Warrants Supported by Ample Probable Cause

The defendant has filed a motion to suppress evidence seized pursuant to the search warrants in this investigation. (Dkt. #30). The only alleged bases for suppression given by the defendant are (1) that the warrants lack probable cause because there was insufficient nexus between the accounts, with the exception of the "Olivia Harris" Facebook account, and criminal activity; and (2) that the warrants were overbroad. *Id.* at 7-8. Each of these arguments is without merit and the motion should be denied.

> Probable cause is judged by an analysis of the totality of the circumstances, which are weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement. Under this pragmatic, common sense approach, we defer to the expertise and experience of law enforcement officers at the scene. At bottom, the proper standard is intended to protect citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime, while at the same time giving fair leeway for enforcing the law in the community's protection. And it is a fluid concept that turns on the assessment of probabilities, not on any formula such as is applied to proof at trial. Thus, even seemingly innocent activity may provide a basis for finding probable cause.

*United States v. Dickey-Bey*, 393 F.3d 449, 453–54 (4th Cir. 2004) (internal citations and quotation marks omitted). The probable cause standard does not:

> Require officials to possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to neatly fit, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information, free of the apprehension that every mistaken search or seizure will present a triable issue of probable cause.

*Taylor v. Farmer*, 13 F. 3d 117, 121-22 (4th Cir. 1993).

Here, each of the warrants was facially valid, supported by ample probable cause, and issued by a neutral magistrate. In reviewing a search warrant application, a magistrate is required to make a practical, common-sense decision as to whether, given all of the circumstances, there is

"a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "To begin with, warrant affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *United States v. Clenney*, 631 F.3d 658, 665 (4th Cir. 2011) (internal citation and quotation marks omitted). A court reviewing a magistrate judge's assessment of probable cause must accord his or her decision "great deference," and should not "invalidate a warrant 'by interpreting [an] affidavi[t] in a hypertechnical, rather than a commonsense, manner.'" *United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir.), cert. denied, 510 U.S. 983 (1993) (quoting *Gates*, 462 U.S. at 236). "So long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Gates*, 462 U.S. at 236 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

A common-sense reading of each of the affidavits in this case demonstrates that each warrant was supported by ample probable cause. The affidavits each set forth the facts of the investigation in lengthy detail, tying each of the accounts and parcels to specific information obtained in the months-long investigation of the exchange of packages and sexually explicit images with minor boys, tied to the defendant—a registered sex offender from a 2008 sex offense conviction, who was caught at the public library in 2017 engaging in the exact same sort of conduct using one of the same alias names.  Each warrant also describes with particularity the place to be searched and the evidence to be seized.

The affidavits here describe in lengthy detail the various exchanges of communications and packages with numerous minor boys, including the exchange of sexually explicit images and videos. The affidavits show how each of the accounts are linked to each other, to the defendant, and/or the communications with the minor boys.  To the extent that the affidavit does not establish,

*before the search was conducted*, that a specific account was used to engage directly in criminal activity, there is ample basis set forth in the affidavits to conclude that there was probable cause to believe that evidence of the offenses would be found in each of the locations and accounts listed. Evidence of the offenses includes, not just incriminating communications with minors, but also other important information such as evidence that ties the user of the account to other accounts communicating with minor boys, as well as evidence of the identity of the person who was operating each of the accounts.

Even if a court finds that an affidavit failed to establish probable cause, a defendant is not entitled to have the evidence from the search suppressed. The Supreme Court has held that when officers seize evidence in good faith reliance on a facially valid warrant issued by a magistrate or judge, and the affidavit is later found to lack probable cause, the evidence is not subject to the exclusionary rule of the Fourth Amendment and is admissible in the government's case-in-chief. *United States v. Leon*, 468 U.S. 897 (1984) (affidavit of experienced narcotics officer who acted in reliance on information provided by informant of "unproven reliability" held to lack probable cause, but evidence seized by agent who acted in good faith reliance on the facially valid warrant was not subject to suppression). *See also United States v. Edwards*, 798 F.2d 686, 690 (4th Cir. 1986). Here, the facts in each affidavit clearly establish probable cause that evidence related to 18 U.S.C. §§ 1470 (Transfer of Obscene Material to Minors), 2422(b) (Coercion and Enticement), and 2251(a) (Sexual Exploitation of Minors), would be found at the locations to be searched. Because the warrants were all supported by probable cause and agent acted in good faith in securing and executing them the motion to suppress should be denied.

In asserting that the warrants for the contents of the electronic accounts are overbroad, the defendant plainly misstates an Eleventh Circuit opinion, claiming it stands for the proposition that:

> [w]arrants for electronic accounts must be limited in scope to the particular data that might constitute evidence of a crime. *See United States v. Blake*, 868 F.3d 960, 974 (11th Cir. 2017) (Facebook warrant "unnecessarily" required "virtually every kind of data that could be found in a social media account" to be turned over).

(Dkt. #30, p.8). In fact, in *Blake* the Eleventh circuit raised a concern about the alleged over-breadth of the warrants in that case, but explicitly declined to rule on the issue, holding that the government relied on the warrants in good faith:

> That said, we need not decide whether the Facebook warrants violated the Fourth Amendment because, even if they did, the district court did not err in allowing the government to use evidence gathered as a result of them. The Facebook warrants fall into the "good-faith exception" to the exclusionary rule established by *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). . . .
>
> As we have already explained, probable cause supported issuance of the warrants. And while the warrants may have violated the particularity requirement, whether they did is not an open and shut matter; it is a close enough question that the warrants were not "so facially deficient" that the FBI agents who executed them could not have reasonably believed them to be valid. As a result, we affirm the district court's decision not to suppress the evidence gathered as a result of Microsoft warrant and the Facebook warrants.

*Blake*, 868 F.3d at 974. The defendant does not cite to any other authority for his allegation that the warrants are overbroad. Other courts considering this question have found that a search of the entire content of an account does not violate the Fourth Amendment if there is probable cause to believe that evidence of a crime will be found within the data:

> [I]t is important to bear in mind that a search warrant does not necessarily lack particularity simply because it is broad. Since a search of a computer is akin to a search of a residence, searches of computers may sometimes need to be as broad as searches of residences pursuant to warrants. Similarly, traditional searches for paper records, like searches for electronic records, have always entailed the exposure of records that are not the objects of the search to at least superficial examination in order to identify and seize those records that are. And in many cases, the volume of records properly subject to seizure because of their evidentiary value may be vast.

> None of these consequences necessarily turns a search warrant into a prohibited general warrant.

*United States v. Ulbricht*, 858 F.3d 71, 100 (2d Cir. 2017), cert. denied, 138 S. Ct. 2708, 201 L. Ed. 2d 1099 (2018) (abrogated on other grounds by *Carpenter v. United States*, 138 S.Ct. 2206, 2214–16 (2018)). The defendant's argument here, like Ulbricht's, "confuses a warrant's breadth with a lack of particularity. . . . [B]readth and particularity are related but distinct concepts. A warrant may be broad, in that it authorizes the government to search an identified location or object for a wide range of potentially relevant material, without violating the particularity requirement. *Id.* at 102.

Here, the warrants clearly set forth the places to be searched and the items to be seized. Given the nature of the content, and the nature of the information contained within the accounts, there was probable cause to believe that a search of the authorized items and accounts would result in the location of information that was authorized to be seized.

### B. The Defendant's Voluntary, *Mirandized* Statements Should not be Suppressed

The defendant has also moved to suppress his post-arrest statements. (Dkt. #29). *Miranda v. Arizona*, 384 U.S. 436 (1966) requires that the police inform a defendant of certain rights when conducting custodial interrogation; however, once informed of these rights, a defendant is free to waive them so long as the waiver is made voluntarily, knowingly, and intelligently. *Id*. at 444. Here, the totality of the circumstances demonstrate that the Defendant's waiver of each of his *Miranda* rights was in fact voluntary, knowing, and intelligent. Indeed, the Defendant executed a written waiver of his *Miranda* rights which investigators went over with him.

After his arrest on July 19, 2019, the defendant was interviewed by investigators. Prior to this interview, the investigators clearly advised him of his *Miranda* rights, verbally and in writing. Ex. 3. After being advised of his rights, the defendant signed the *Miranda* waiver form, and

indicated that he understood his rights and was willing to answer questions without an attorney present.  *Id*.  He did not invoke his right to counsel at any time during the interview, and his waiver of his *Miranda* rights was knowing, intelligent and voluntary.

The initial interview was conducted in a non-coercive manner, with no improper or false promises or inducements. The defendant's statements to the investigators were voluntary and are admissible.  Following his initial interview with investigators, the defendant then agreed to participate in a polygraph examination and related interview.  Before the polygraph examination began, the defendant was again advised of his Miranda rights, and he again waived those *Miranda* rights in writing.  Ex. 4.

"[T]he test for determining whether a statement is voluntary is 'whether the confession was extracted by any sort of threat or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of improper influence.'" *United States v. Braxton,* 112 F.3d 777, 786 (4th Cir. 1997) (Murnaghan, J., dissenting) (quoting *Hutto v. Ross*, 429 U.S. 28, 30 (1976)) (internal citations omitted). "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity, however, does *not* automatically render a confession involuntary." *Id.* at 780 (Williams, J., for the court) *(*quoting *United States v. Pelton,* 835 F.2d 1067, 1071 (4th Cir. 1987) (emphasis added). Rather, "[t]he proper inquiry 'is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'" *Id.* (internal citations omitted).

Ordinarily, only "coerced confessions procured by means 'so offensive to a civilized system of justice that they must be condemned,'" are suppressed. *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (quoting *Miller v. Fenton*, 474 U.S. 104, 109 (1985)). The reviewing "court[] must consider 'the "totality of the circumstances," including the characteristics of the

defendant, the setting of the interview, and the details of the interrogation,'" in this regard. *Braxton*, 112 F.3d at 780 (internal citations omitted) (quoting *Pelton*, 835 F.2d at 1071).

The circumstances here weigh heavily in favor of a knowing and voluntary nature of both the statement that the defendant made initially to the investigators, and the statement he made after the polygraph examination. The interviews were not conducted in a coercive atmosphere, and the officers' routine post-arrest questioning did not critically impair the defendant's capacity for self-determination. There is simply no evidence, and no argument made by the defendant, that investigators used any sort of threat or violence, or that they made any direct or implied promise, or that the interviews involved any type of exertion of improper influence. Under the totality of the circumstances test, the statements made by the defendant were entirely voluntary and in no way "offensive to a civilized system of justice." *Ledbetter*, 35 F.3d at 1067. The defendant's motion to suppress statements should be denied.

## IV.   CONCLUSION

For all of the above reasons, the Government respectfully requests that the defendant's pre-trial motions be denied.

    Respectfully submitted,

    ROBERT K. HUR
    United States Attorney

By:     /s/
    Mary W. Setzer
    Christine L. Duey
    Assistant United States Attorneys
    36 S. Charles Street, 4th Fl.
    Baltimore, Maryland 21201